# EXHIBIT A

## <u>AFFIDAVIT OF WENDELL MACKEY</u>

I, Wendell Mackey, being first duly sworn, deposes and says:

1.      I am an adult of sound mind and body and am otherwise competent to testify to the allegations averred herein.

2.      I make this Affidavit based upon personal knowledge to which I could testify if called upon to do so.

**A.      <u>Return to Adrian, Michigan</u>**

3.      During 2003, I moved from the City of Adrian, Michigan, to the City of Plymouth, Michigan.

4.      During 2005, I moved from the City of Plymouth, Michigan, to Washington, D.C. to attend law school.

5.      After completing law school in Washington, D.C., during 2008 I returned to Michigan, took up residence in Northville, Michigan, and began working towards a Master's in Business Administration ("MBA") with a concentration in finance.

6.      During 2011, I begin investing in real estate and renovating homes in the City of Adrian.  I sold some of the houses that I renovated and retained several which I leased to tenants.

7.      As a property owner in the City of Adrian, I soon discovered that I was seemingly always indebted to City Hall.  This piqued my interest in who was managing the city.

8.      My research revealed that several of the City Commissioners, including Defendant James Berryman, had no academic credentials beyond a mere high-school diploma.

9.      I concluded that there was a dearth of academic credentials among the City Commissioners which, in my opinion, resulted in the City Commission rendering economic decisions that made no economic sense.

10.     I decided that I could possibly be of help to the local community an at City Hall.

11.     In light of the unfortunate events in 1986, when I attended City Commission meetings, I made a conscious effort to avoid Defendant James Berryman.

12.     Prior to Defendant James Berryman investigating and verbally attacking me during a City Commission meeting on June 17, 2017, I had attended and spoke at City Commission meetings without incident.

**B.      ExposingAdrian.com**

13.     My attendance at City Commission meetings caused me to conclude that something was awry at city hall.

- 2 -

14.    Accordingly, on or about April 27, 2017, I began publishing articles regarding public issues of local concern on ExposingAdrian.com.

15.    I fully understood the local political milieu and feared that local officials such as Defendant James Berryman might attempt to retaliate against me for publishing articles on ExposingAdrian.com, so I decided that it was in my best interests to exercise my First Amendment right to publish articles anonymously.

16.    The ExposingAdrian.com website was intended to present critical analysis of local politics, policy, and socioeconomic issues.

17.    Some of the articles that I published on ExposingAdrian.com included:

    A.  "Adrian City Commission Places Its Decisions at Risk by Violating Open Meetings Act"

    B.  "City Officials Pillage Park Trust Fund to Pay Employee Wages and Benefits"

    C.  "Legislative Study on Poverty Finds Lenawee County One of 'Least Desirable' Counties in Michigan"

    D.  "Defendant Berryman Criticizes Predecessors for Hording Oil Revenues Then Does the Same"

    E.  "Why Berryman's Adrian College Property Give-Away is Illegal"

Haddad Law Firm, PLC.

F.  "Berryman's Political Cronies Make over $20,000 from City's Website Pop-Up Ad"

G.  "Mayor and Entire City Commission are All from Affluent 4th Precinct"

H.  "Berryman Blocks Us on Twitter and Then Offers Lies to Defend Corruption"

I.  "The Truth about the Biergarten: Berryman Attempts another Backroom Deal, Commission Rightfully Shuts Him Down"

18.     I feared that local officials might retaliate against me for authoring these anonymous articles, so I ensured that statements of fact were supported by and hyperlinked to official public records.

19.     Obtaining official public records required that I submit Freedom of Information Act requests to the City Attorney, so Defendant Berryman and other city officials soon knew that I was in fact the author of these articles.

20.     The articles on ExposingAdrian.com were a success, and prior to Defendant Noe issuing her *ex parte* prior restraint, they had received almost 15,000 views in a small town of only approximately 20,000 people.

Haddad Law Firm, PLC.

- 4 -

### C.      Decision to Run for Office

21.     Realizing that I was going to be unable to effectuate the change that I desired to see through political blogging, I decided to run for City Commissioner during the spring of 2017.

22.     On April 27, 2017, I filed my Nominating Petition with the requisite number of signatures and completed and filed an Affidavit of Identity and Receipt of Filing, which required that I disclose my date of birth.

### D.      The Letter to the Editor

23.     On May 20, 2017, the local newspaper, The Daily Telegram, published a Letter to the Editor that I had written in which I criticized the City Commission for ratifying a backroom deal brokered by Defendant Berryman in such a manner as to circumvent the local City Commission political process.

24.     Defendant Berryman's conduct was so inappropriate that other local political officials publicly chastised Defendant Berryman's improper attempt to circumvent the local City Commission political process.

25.     Consequently, I authored a letter to the editor of The Daily Telegram, criticizing City Commissioners for approving the backroom deal and failing to hold Defendant Berryman accountable for his inappropriate actions that smacked of political corruption.

26.     In this letter, I suggested that the timing of Defendant Berryman's backroom deal "smacks of fraud, corruption and kickbacks."  I concluded his letter with the rallying cry that Defendant Berryman "and his sycophantic 'yes men' on the city commission must go during this November's election."

### E.     **Defendant Berryman's Investigation**

27.     Unbeknownst to me at the time, Defendant Berryman had already begun to investigate me.

28.     According to Defendant Berryman, he first obtained public records about me from the local courthouse.  He then instructed the City Clerk to provide him with a copy of my Affidavit of Identity and Receipt of Filing.

29.     According to Defendant Berryman, he then juxtaposed the public records that he had obtained about me from the local courthouse with my Affidavit of Identity and Receipt of Filing.

30.     Because my name and date of birth contained within the public records matched my name and date of birth contained within my Affidavit of Identity and Receipt of Filing, Defendant Berryman concluded that I had been involved in a criminal offense involving his business back in 1986.

Haddad Law Firm, PLC.

Haddad Law Firm, PLC.

**F.**   **The Exchange at the June 19, 2017, City Commission Meeting**

31.   During the June 19, 2017, City Commission meeting, Defendant Berryman verbally introduced and attempted to pass a motion on behalf of his friends and/or acquaintances.

32.   I spoke out against Defendant Berryman's motion because it was not on the City Commission agenda and thus failed to provide members of the community the notice of Defendant Berryman's verbal motion prior to the meeting.

33.   I also spoke out against Defendant Berryman's motion on the basis that the same friends and/or acquaintances had recently received millions of dollars in taxpayer money so they could engage in "historical preservation" of two buildings merely yards away from the historic building that they now sought to destroy in the name of "modernizing" the city, which contradicted Defendant Berryman's prior claims that the city had a policy preserving historic buildings in the downtown area.

34.   Ultimately, Defendant Berryman's attempt to pass the verbal motion failed, and after heated debate among Commissioners and the public, Defendant Berryman's friends and/or acquaintances withdrew their offer to develop the property due to "the political circus this has turned into."

35.     Defendant Berryman was visibly disappointed and upset by this defeat and his failure to pass the motion for this friend / acquaintance investors.

36.     During the public comment segment at the end of the City Commission meeting, I spoke out against the "hidden agenda" that was clearly in play at the meeting.

37.     Defendant Berryman interrupted I, and in an attempt to publicly humiliate me and shame me from city hall, Defendant Berryman rudely interjected and asked whether I was the same person who had "robbed my flower shop back in 1986?"

38.     The question was perceived as so inappropriate by spectators that at least one candidate for City Commissioner audibly gasped in shock that Defendant Berryman would make such an inappropriate personal attack during a public City Commission proceeding.

39.     In response to Defendant Berryman's highly inappropriate personal attack, I conceded that I was in fact the individual who Defendant Berryman believed me to be.  I then attempted to explain, albeit somewhat unartfully, how Defendant Berryman, who at the time of the incident was the 39-year-old Mayor of Adrian, had egregiously abused his political power by ensuring that I, who was at the time a 19-year-old teenager, received the greatest penalty possible under Michigan law for a relatively minor property offense.

40.    Defendant Berryman attempted to interrupt me to prevent him from speaking further, but I continued to share how Defendant Berryman's political corruption was the very impetus behind my decision to attend law school and to toss my hat into the local political arena.

41.    After I finished speaking and departed from the lectern, a candidate for City Commissioner approached the lectern and stated that Defendant Berryman owed me an apology for his inappropriate personal attack.  Spectators attending the meeting applauded in approval.

42.    After the City Commission meeting ended, several spectators approached me, including city officials and other political candidates, and offered expressions of disbelief, empathy, and support.

43.    At no time did anyone, including the Adrian Chief of Police who was present at the meeting, suggest that my response was hostile or threatening.

44.    At no time did anyone, including the Adrian Chief of Police who was present at the meeting, suggest that I leave the meeting for inappropriate conduct.

45.    At least one political candidate subsequently opined that Defendant Berryman was "the aggressor" towards me, and every political candidate who has spoken to me regarding the incident has uniformly expressed that I handled the situation "very well."

46.    At no time before, during, or after the June 19, 2017, did Defendant Berryman request that I cease communicating with him.

47.    Immediately after the June 19, 2017, City Commission meeting, Defendant Berryman filed a complaint with the City of Adrian Chief of Police pertaining to the incident.

48.    The Chief of Police parsed the audio recording of the June 19, 2017, City Commission meeting and informed Defendant Berryman that I had not threatened him.

49.    Defendant Berryman then reported to the Chief of Police that he felt threatened by (a) my "looks and gesturing," (b) my Letter to the Editor published on May 20, 2017, and (c) by nonspecific posts on unspecified social media.

50.    The Chief of Police closed the case on the basis that I had not violated Michigan Compiled Laws, M.C.L. 750.411h, M.C.L. 750.411i, and/or M.C.L. 750.411s.

51.    At no time before, during, or after Defendant Berryman's report to the Chief of Police did Defendant Berryman request that I cease communicating with him.

**G.    The Exchange at the July 3, 2017, City Commission Meeting**

52.    A large number of city employees had attended the June 19, 2017, City Commission meeting to address the City Commission regarding a concern.

- 10 -

53.     Defendant Berryman engaged in such lengthy debate several times that it caused the meeting to continue for hours, and it prevented the city employees from being heard at the meeting.

54.     Concerned that such a large group of people were denied the right to be heard, during the next City Commissioner meeting on July 3, 2017, I brought this matter to the attention of the City Commission.

55.     During the public comment segment, I read short excerpts from Section 43 and Section 47 of the Robert's Rules of Order Newly Revised into the record and pointed out that the impartiality requirement imposed upon the chair of the Presiding Officer precludes debating from the chair.  I further pointed out that Robert's Rules of Order Newly Revised precluded members of the Commission from engaging in debate on a particular matter more than twice during a session.

56.     I noted that the procedure that occurred during the June 19, 2017, City Commission meeting violated these provisions and undermined the integrity of the impartiality requirement imposed upon the Presiding Officer of the City Commission.  I further expressed concern that because of these violations of fundamental parliamentary procedure numerous city employees who attended the meeting left the meeting without being heard.

57.     Defendant Berryman became visibly upset by my comments and responded by claiming that the City Charter allowed him to disregard to the

Haddad Law Firm, PLC.

Robert's Rules of Order despite having claimed merely seconds before that City

Committee meetings are governed by Robert's Rule of Order.

58.     Defendant Berryman further claimed that he and the City Attorney

(who was not present at the meeting) had previously discussed the matter and that

the City Attorney opined that Defendant Berryman could debate from the chair as

the Presiding Officer despite the longstanding and well-established prohibition of

such conduct.

59.     At no time before, during, or after the July 3, 2017, did Defendant

Berryman request that I cease communicating with him.

### H.     The July 5, 2017, Electronic Mail to the City Attorney

60.     Two days later, on July 5, 2017, I sent an electronic mail message to

the City Attorney, expressing concern regarding Defendant Berryman's claim that

the City Attorney had allegedly approved of Defendant Berryman's violation of

fundamental tenets of parliamentary procedure.

61.     In an effort to avoid a claim that I had engaged in inappropriate *ex

parte* communication with the City Attorney without notice to Defendant

Berryman and to better articulate his concerns to his local elected representatives,

when I dispatched this electronic mail message to the City Attorney, I caused a

copy of the electronic mail message to be dispatched to every City Commissioner,

including Defendant Berryman, at their respective official City of Adrian email address. *Id*.

62.   Defendant Berryman was chagrined by my electronic mail because some City Commissioners respected Defendant Berryman as the *de facto* parliamentarian, and my electronic mail message revealed to the City Commission Defendant Berryman's lack of knowledge regarding fundamental tenants of parliamentary procedure.

63.   At no time before, during, or after I sent my July 5, 2017, electronic mail message did Defendant Berryman request that I cease communicating with him.

I.     **The July 6, 2017, Personal Protection Order**

64.   The following day, July 6, 2017, Defendant Berryman filed a Petition for Personal Protection Order, seeking an *ex parte* Personal Protection Order against me based upon my news reporting on matters of local public concern and my core political expressions critical of local government officials.

65.   In support of his Petition, Defendant Berryman claimed that he needed a Personal Protection Order against me because:

A. Thirty-two years ago, I was convicted of breaking and entering into his flower shop for which I was sentenced to prison;

- 13 -

B. I had written a letter to the editor of the local newspaper that was published by the local newspaper on May 20, 2017, in which I "made accusations of fraud, corruption & kickbacks, etc";

C. During the June 19, 2017, City Commission meeting, Defendant Berryman confronted me about breaking into Defendant Berryman's business 32 years ago, and in response, I went into a "rant" with which Defendant Berryman disagreed;

D. I "continue[d] to post false accusations on social media not only against [Defendant Berryman] but, false statements of private citizens that are friends of [Defendant Berryman] – using their pictures and copies of their signatures without their permission";

E. I sent an electronic mail message on July 5, 2017, to the City Attorney, expressing concern regarding Defendant Berryman's refusal to adhere to parliamentary procedure;

F. My "use of social media & emails & public encounters are escalating in frequency & hostile tone"; and

G. I "clearly blame[d] [Defendant Berryman] for [my] incarceration in 1986 & carr[y] those misguided feelings to this date."

66.    At no time before Defendant Berryman filed his Petition did he ever request that I cease communicating with him.

- 14 -

67.     Defendant Berryman fraudulently concealed and failed to disclose in his Petition:

A.  That duing the 32-year intrim, I had earned a baccalaureate (B.A.) degree *summa cum laude* from Eastern Michigan University, a Juris Doctorate (J.D.) degree *cum laude* from the University of the District of Columbia law school, was nearing completion of a Master's in Business Administration (MBA) with a concentration in Finance at Eastern Michigan University, that I was successfully self-employed, a local real estate investor, landlord, and a contributing member of the local community;

B.  That my letter to the editor did not in any way threaten Defendant Berryman but, instead, merely contained political speech regarding Defendant Berryman's backroom dealings that Defendant Berryman did not like and which angered Defendant Berryman;

C.  That during the June 19, 2017, City Commission meeting, I accused Defendant Berryman of abusing the judicial process to exact revenge upon me.  I did not say anything even remotely similar to a threat, and the Chief of police refused to press charges because Mr. Mackey had engaged in no wrongdoing;

Haddad Law Firm. PLC.

- 15 -

D. That the "false accusations on social media" alleged by Defendant
Berryman were neither false nor were posted on social media;
rather, they were news articles supported by public records that
were posted on my privately-registered domain name
ExposingAdrian.com;

E. That my electronic mail message on July 5, 2017, to the City
Attorney, contained wholly appropriate concerns regarding
Defendant Berryman's refusal to adhere to parliamentary
procedure, and Defendant Berryman never once indicated to me
that he did not want me to contact him as the Mayor of Adrian;

F. That my "use of social media & emails & public encounters" had
not escalated "in frequency & hostile tone," and to the extent that
they had, it was solely in the context of me, as a candidate for City
Commission, criticizing Defendant Berryman, as the incumbent
candidate for Mayor;

G. That I never once mentioned anything about the unfortunate
incident occurring 32 years ago during 1986 until Defendant
Berryman verbally attacked I during the June 19, 2017, City
Commission meeting.  Nor did Defendant Berryman reveal that
after he had verbally attacked me during this City Commission

- 16 -

meeting another candidate for City Commission indicated that

Defendant Berryman owed me an apology for Defendant

Berryman's crude and unnecessary verbal attack on me, a

comment that drew applause from spectators.

68.     The following day, July 7, 2017, Defendant Noe issued a Personal

Protection Order *ex parte* without giving me any advance notice or opportunity to

be heard.

69.     Pursuant to the terms of Defendant Noe's *ex parte* Personal Protection

Order, I was unable to:

    A. Participate in City Commission meetings;

    B. Participate in Downtown Development Authority meetings;

    C. Visit city hall;

    D. Approach or confront Defendant Berryman even in my capacity as
       candidate for City Commissioner and Defendant Berryman's
       capacity as Mayor of Adrian;

    E. Send electronic mails or other communications to Defendant
       Berryman even in my capacity as candidate for City Commissioner
       and Defendant Berryman's capacity as Mayor of Adrian;

    F. Post a message through the use of any medium of communication,
       including the Internet or a computer or any electronic medium, and

Haddad Law Firm, PLC.

- 17 -

including writing articles of public concern on

ExposingAdrian.com.

70.     The basis for Defendant Noe's refusal to provide me with any pre-deprivation notice and opportunity to be heard is that "irreparable injury, loss, or damage will result from delay required to give notice or notice itself will precipitate adverse action before an order can be issued."

71.     Defendant Noe issued the Personal Protection Order on the basis that I had violated Michigan Compiled Laws, M.C.L. 750.411h, M.C.L. 750.411i, and/or M.C.L. 750.411s despite the fact that the Chief of Police had already determined that I had not violated these statutes.

72.     Defendant Noe issued the Personal Protection Order either without reading Defendant Berryman's Petition or without requiring that Defendant Berryman's Petition comply with mandatory pleading specificity requirements.

73.     Defendant Noe, a contributor to Democratic candidates, knew or reasonably should have known that there was no basis in law that could support issuing a Personal Protection Order *ex parte* on behalf of Defendant Berryman, a Democratic candidate, against me for wholly political activity that lies at the core of the First Amendment.

74.     Defendant Noe, a contributor to Democratic candidates, issued a Personal Protection Order *ex parte* on behalf of Defendant Berryman, a

- 18 -

Democratic candidate, against me in an effort to silence my criticism of Defendant Berryman and to provide Defendant Berryman a competitive advantage in the local election.

**G.     The July 8, 2017, Electronic Mail to the City Attorney**

75.     The following day, July 8, 2017, I sent an electronic mail message to the City Attorney and Chief of Police, providing them with my political itinerary, asking that they please advise Defendant Berryman regarding my itinerary so that there was no contact between he and I and apprising them that I would immediately contact 911 in the event that Defendant Berryman appeared in the same vicinity as I.

76.     I explained that the reason I was sending the electronic mail message was that Defendant Berryman "has chosen to abuse the legal process for political reasons and secure a Personal Protection Order against me to silence debate and stifle opposing viewpoints" and that me "d[id] not believe that [Defendant Berryman]  should be able to capitalize upon the situation by excluding me from political campaign related activities, which is the real reason he secured this absurd Personal Protection Order against me in the first place."

77.     No one replied to my electronic mail message or otherwise requested that I cease communicating with them.

### A.   <u>The Motion to Set aside PPO</u>

78.    Three days later, on July 11, 2017, I filed a Motion to Set Aside Ex
Parte Personal Protection Order.

79.    On July 26, 2017, Defendant Noe recused herself, and the matter was
reassigned to Washtenaw County Circuit Court Judge Richard Conlin, Jr.

### H.   <u>The July 18, 2017, NAACP Candidate's Forum</u>

80.    Before each City of Adrian election, the local branch of the NAACP
holds a Candidate's Forum, which is hosted at the Siena Heights University in
Adrian, Michigan.

81.    Audio of the Candidate's Forum is broadcast live on the local radio
station WLEN, and video of the Candidate's Forum is posted on the local
newspaper's Facebook account www.facebook.com/thedailytelegram/

82.    The purpose of the Candidate's Forum is to provide local political
candidates an opportunity to express their political positions and platforms to
members of the local community, so voters can make an informed choice regarding
the candidate for whom they vote.

83.    In a commendable effort to allow me to be heard, the NAACP
brokered an agreement between me and Defendant Berryman, whereby Defendant
Berryman agreed that he would not appear during the first half of the Candidate's
Forum so that I could be given an opportunity to be heard and present my political

positions and platform to the local community.  I agreed that after I was given this opportunity I would then leave the Candidate's Forum so that Defendant Berryman could be given a similar opportunity to be heard and present his political positions and platform to the local community.

84.     A few days later, on July 17, 2017, the evening prior to the Candidate's Forum, Defendant Berryman gave a statement to a local radio station WLEN, claiming that I "still ha[ve] a vendetta today focused on [him] 32 years later saying that it's my fault that he went to prison" and that "[i]n today's world, that's a little scary."  Defendant Berryman further stated that for me "to be focused on me for 32 years, blaming me for his imprisonment, is a little unnerving."

85.     Approximately 3 hours before the Candidate's Forum was scheduled to begin, Defendant Berryman's attorney telephoned my attorney, claiming that I was already in "direct violation" of the Personal Protection Order for sending the City of Adrian Attorney the electronic mail containing my political itinerary in an attempt to avoid contact with Mr. Berryman.

86.     Defendant Berryman's attorney further indicated in his voicemail that if I "confronted, approached, or followed" Defendant Berryman then Defendant Berryman would report me to the police for violating the Personal Protection Order.

87.     I had never "confronted, approached, or followed" Defendant Berryman.

88.     Defendant Berryman now claimed through his attorney that he "prefer[ed] not to have any contact" with me despite having no problem initiating the confrontation with me during the June 19, 2017, City Commission meeting.

89.     I arrived at the Candidate's Forum at the Siena Heights University shortly after 6:30 p.m.  Shortly after arriving, Defendant Berryman arrived at the Candidate's Forum in complete violation of the agreement that he had been brokered by NAACP representatives.

90.     Intercessors requested Defendant Berryman to remain outside of the building and in his vehicle until after I had been given an opportunity to speak at the Candidate's Forum, but Defendant Berryman refused to do so and insisted on entering the room where I was already seated and prepared to speak.

91.     Because of Defendant Berryman's breach of agreement and refusal to remain outside of the building until after I had been given an opportunity to speak at the Candidate's Forum, I was forced to leave the room that was already filled with hundreds of people prepared to hear City Commissioner candidates speak.

92.     Because of Defendant Berryman's breach of agreement and refusal to remain outside of the building until after me had been given an opportunity to speak at the Candidate's Forum, I was denied the opportunity to speak at the

Candidate's Forum, and I believe that this was the precise outcome that Defendant Berryman sought to achieve when he wrongfully obtained the Personal Protection Order against me.

93.     Other candidates at the forum expressed concern that I had been denied the opportunity to share my political views and platform during the Candidate's Forum.

94.     Defendant Berryman's insistence on repeatedly confronting me confirms to me that he did not obtain the Personal Protection Order against me because he fears that I may harm him physically but, rather. because he fears that I may harm him politically.

**B.     The Three-Day Evidentiary Hearing**

95.     On August 28, 2017, almost to months after Defendant Noe had issued the Personal Protection Order, Judge Conlin began the first day of what would eventually become a three-day evidentiary hearing.

96.     During the first day of the evidentiary hearing, Judge Conlin asked Defendant Berryman why he was in need of a PPO, and Defendant Berryman explained that "it started with postings and really a letter to the editor that was dated May 20th of this year, signed by Mr. Mackey."

97.     Defendant Berryman was upset about a sentence contained in my Letter to the Editor, which stated that "Jim Berryman's most recent backroom deal smacks of fraud, corruption, and kickbacks."

98.     Defendant Berryman also took exception to political news articles that I was publishing on my anonymous news blog ExposingAdrian.com.

99.     Defendant Berryman admitted that it was he who confronted Mackey and not me who confronted him during the June 19, 2017, City Commission meeting.

100.     Notwithstanding the fact that Defendant Berryman was the one who instigated the confrontation, Berryman was "concerned" about the content of my response and found it to be "very unnerving."

101.     During cross-examination, Defendant Berryman candidly admitted that I had never stalked him.

102.     Defendant Berryman further admitted that he confronted me during the June 19, 2017, City Commission meeting in retaliation for the posts that I had made online and for my Letter to the Editor.

103.     Defendant Berryman admitted that his confronting me was not part of official city business and that he could have done so in a non-public setting.

104.     Defendant Berryman also admitted that he did not like what I was publishing about him online.

105.   After consulting with legal counsel, Defendant Berryman included allegations in his Petition regarding my blogging and social media posts.

106.   After I initiated the present civil rights lawsuit on July 21, 2017, and Defendant Berryman had an opportunity to consult with the current counsel, Defendant Berryman changed his story and claimed that my online posts were not the basis for his seeking the PPO.

107.   Rather, Defendant Berryman now claimed that "[i]t was [my] response to [him] to that question [during the June 19th City Commission meeting] that prompted the PPO, not all the postings."  However, when asked how my single July 5th electronic mail message could support the allegation in his Petition that "emails and public encounters are escalating in frequency and hostile tone," Defendant Berryman relied upon my authorship of political news articles on ExposingAdrian.com and the Letter to the Editor that the local newspaper published almost two months prior to Defendant Berryman filing his Petition for a PPO.

108.   Defendant Berryman admittedly sought and obtained the PPO against me because he did not like that I "[wa]s not taking responsibility for [my] actions."

109.   During cross-examination, Defendant Berryman claimed that he delayed filing his Petition for Personal Protection Order for 17 days after the June

19, 2017, confrontation because he could not figure out how to complete the one-page Petition for Personal Protection Order.

110.   When my attorney asked Defendant Berryman why he had waited until July 6, 2017, to file his Petition for a PPO, Defendant Berryman explained that he "didn't go to an attorney."  However, 11 days after Defendant Noe issued the PPO, Defendant Berryman told a local radio station that he filed the PPO because he had "talked to legal counsel" and "a PPO was the suggested way to go ...."

111.   Notwithstanding this statement and his ready access to the City Attorney, Berryman adamantly maintained that it took him 17 days to figure out how to complete the one-page Petition for Personal Protection Order form because he "had no assistance in filling out a PPO from any attorney."[1]  T-III, p 64.

112.   During the state court evidentiary hearing, the City of Adrian Chief of Police, City Commission Candidate Devin Stevens, City Commission Candidate Devin Stevens, Mayoral Candidate (now Mayor) Chuck Jacobson, City Commissioner Allen Heldt, City Commissioner John Dudas all testified on my behalf and maintained that I had not threatened Defendant Berryman but, rather, Defendant Berryman had inappropriately instigated the confrontation.

---

[1]  Berryman maintained this claim despite even this Court acknowledging that "the PPO form, approved by the State Court Administrative Office, was written in plain English and was designed for use by individuals proceeding without attorneys."  *People v Cramer*, unpublished opinion *per curiam* of the Court of Appeals, issued March 10, 2009 (Docket No. 288449) (attached as **Appendix C**).

Haddad Law Firm, PLC.

C.    <u>**The Lower Court's Ruling and Order**</u>

113.    During the state court evidentiary hearing, Judge Conlin refused to consider my Letter to the Editor as part of Defendant Berryman's Petition for a PPO.

114.    Judge Conlin further opined that he had reviewed the political news articles that I had published on ExposingAdrian.com and that he "kind of looked at them as political in nature."

115.    At the end of the three-day state court evidentiary, Judge Conlin set aside certain aspects of Defendant Noe's PPO.

116.    Specifically, Judge Conlin ruled that I could "post a message through the use of any medium of communication, including the Internet or a computer or any electronic medium ...."  This allowed me to resume by political blogging activities.  Defendant Noe's PPO had expressly enjoined me from engaging in this expressive conduct.

117.    Judge Conlin further "d[id] not restrict [my] ability to confront [Defendant Berryman] in the context of public speech and/or debate."  Defendant Noe's PPO had restricted my ability to confront Defendant Berryman in the context of public speech and/or debate throughout almost all of the 2017 local election cycle.

118.   Judge Conlin also ruled that he was "not restricting [me] from contacting [Defendant Berryman] by telephone."  Defendant Noe's PPO had restricted my ability to contact Defendant Berryman by telephone throughout almost all of the 2017 local election cycle.

119.   A review of Judge Conlin's ruling indicates that he went to some lengths to accommodate my ability to conduct my political campaign.  Conversely, Defendant Noe's order had shut down my campaign for months during the peak of the 2017 local election cycle.

120.   Defendant Noe entered her more expansive PPO on July 7, 2017, and it remained in place for most of the 2017 local election cycle.

121.   Judge Conlin did not make his ruling setting aside certain portions of Defendant Noe's PPO until October 10, 2017, merely weeks before the general election.

122.   Judge Conlin sustained the PPO based upon (a) Mackey's belief that his 1986 sentence which exponentially departed from the sentencing guidelines may have been the result of Berryman bringing political influence to bear upon the matter, (b) Mackey's July 5th electronic mail message to the City Attorney regarding Berryman's claim that he was not constrained by parliamentary procedure, and (c) Mackey's July 8th electronic mail message to the City Attorney regarding the parties' respective campaign itineraries.

FURTHER AFFIANT SAITH NOT.

Dated: January 10, 2019

_____
Wendell Mackey

Subscribed and sworn to before me this
10th day Of January, 2019.

Signature:  ____*/s/ Issa G. Haddad*_____
Issa G. Haddad, Notary Public
State of Michigan, County of Oakland
My commission expires 4/19/2020

Haddad Law Firm, PLC.